IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| RENATTA LINDSEY, as personal representative of the Estate of ANTWAN LINDSEY, deceased and in her individual capacity as wrongful death beneficiary of ANTWAN LINDSEY, deceased,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF COLUMBUS, OHIO, KATE MCSWEENEY-PISHOTTI, ELAINE BRYANT, SHOOTER 1, SHOOTER 2, SHOOTER 3, SHOOTER 4, SERGEANT GOODRICH, and JOHN DOES NOS. 1-15,<br><br>Defendants. | Case No.: 1:25-cv-00463<br><br>Judge:<br><br>Jury Trial Demanded |

**COMPLAINT**

Plaintiff Renatta Lindsey, as personal representative of the Estate of Antwan Lindsey, deceased, in her individual capacity as wrongful death beneficiary of Antwan Lindsey, deceased ("Plaintiff"), by and through undersigned counsel, brings this Complaint against Defendants City of Columbus, Ohio, Director of Public Safety Kate McSweeney-Pishotti, Chief of Police Elaine Bryant, and John Does Nos. 1-15 (collectively, "Defendants"), and make the following allegations upon personal knowledge as to Plaintiff's own acts, upon information and belief, and Plaintiff's attorneys' investigation as to all other matters, and states as follows:

**I. INTRODUCTION**

1. This action arises out of the July 8, 2023, tragic shooting death of Antwan Lindsey ("Mr. Lindsey"), a Black man, who was shot by police officers with the Columbus Division of Police

in Columbus, Ohio, at a point when he was unarmed and posed no threat of serious bodily harm to officers or others.

2. Plaintiff brings this action for survivorship and wrongful death damages, pursuant to 42 U.S.C. §§ 1983 and 1988, resulting from the deprivation of the decedent, Antwan Lindsey's, clearly established rights as secured by the Fourth and Fourteenth Amendments to the United States Constitution.

## II. PARTIES

### A. Plaintiffs

3. At all times relevant herein, Plaintiff Renatta Lindsey is the personal representative of the Estate of Antwan Lindsey, deceased, and a resident of Houston, Texas.

4. Plaintiff is the proper party to bring claims on behalf of the Estate of Antwan Lindsey and is the wrongful death beneficiary of Antwan Lindsey.

### B. Defendants

5. At all times relevant herein, all Defendant officers referenced herein below were employed as police officers for Defendant City of Columbus, Ohio, and were acting under and/or outside color of law and/or pursuant to the practices, policies, customs, and/or usages of the City of Columbus.

6. Defendant Shooter 1 (Name Redacted) is a police officer for Defendant City of Columbus, hired June 24, 2013, was on duty July 8, 2023, and upon information and belief is a resident of Franklin County who fired 13 rounds at Mr. Lindsey and handcuffed him after he was shot down in the doorway of the apartment building as aforesaid.

7. Defendant Shooter 2 (Name Redacted) is a police officer for Defendant City of Columbus, hired June 7, 2014, was on duty July 8, 2023, and upon information and belief is a

resident of Franklin County who fired 12 rounds at Mr. Lindsey from a single-leg kneeling position.

8. Defendant Shooter 3 (Name Redacted) is a police officer for Defendant City of Columbus, hired on June 14, 2021, was on duty with Officer Zachritz on July 8, 2023, and upon information and belief is a resident of Franklin County who fired 10 rounds at Mr. Lindsey.

9. Defendant Shooter 4 (Name Redacted) is a police officer for Defendant City of Columbus, hired December 8, 2021, was on duty with Officer Andres on July 8, 2023, and upon information and belief is a resident of Franklin County who fired 3 rounds at Mr. Lindsey.

10. Defendant Sergeant Goodrich is a police officer for Defendant City of Columbus, and upon information and belief is a resident of Franklin County who was in the hallway of the apartment with the four Columbus police officers who shot Mr. Lindsey and supervised them at the time they shot Mr. Lindsey.

11. At all times relevant herein, Chief Elaine Bryant ("Defendant Bryant") was employed by Defendant City of Columbus as the Chief of Police with supervisory control and top policy making authority over of all police stations and substations, police officers, and employees of the Columbus division of police.

12. At all times relevant herein, Defendant Kate McSweeney-Pishotti ("Defendant McSweeney-Pishotti") was employed by Defendant City of Columbus as the director of public safety as the executive head of the division of police, having all powers and duties connected with and incident to the appointment, regulation, and government of the department, including the exclusive power to fire the Chief of Police. *See* §§ 101, 107 of the Charter of the City of Columbus.

13. At all times relevant herein, Defendant(s) John Does Nos. 1-15, whose names and addresses are unknown despite the exercise of reasonable diligence, are believed to be police officers, supervisors, commanders, and/or other administrative, division of police, or City employees

3

of Defendant City of Columbus whose identities or involvement in the events giving rise to the claims asserted herein cannot be ascertained and/or discovered by Plaintiffs at the present time, but whom, through conducting discovery, may become known as being persons properly included as Defendants in this matter.

14. At all times relevant herein, Defendant City of Columbus, Ohio ("Defendant City") is a municipal corporation located in Franklin County, Ohio.

15. At all times relevant to this action, Defendant City employed Defendants McSweeney-Pishotti, Bryant, and all police officers identified herein.

16. According to Defendant City Police Department's website, the Columbus Police Department's mission statement states in relevant part, "Guided by the Constitution, our Core Values, and steadfast adherence to ethical conduct, we are in service to safeguard the lives, property, and rights of all."[1]

17. The Columbus Police Department's vision statement says, in relevant part, "The Columbus Division of Police will contribute to a safer city by valuing its employees and the community it serves."

18. The Columbus Police Department (hereinafter CPD) also lists on its website five core values that spell out the word P.R.I.D.E.:

 a. *Professionalism*: "Demonstrating excellence in our words and actions through leadership, cooperation, dedication, and attention to detail."

 b. *Respect*: "Expressing empathy and demonstrating appreciation for human dignity, diversity, and individual rights while holding reverence for human life above all else"

---

[1] https://www.columbus.gov/Services/Public-Safety/Police/About-the-Columbus-Division-of-Police/Mission-Statement.

4

c. *Integrity*: "Consistently demonstrating honesty, transparency, and ethical behavior and accepting responsibility for our actions."

d. *Discipline*: "Exhibiting proper conduct and demonstrating commitment to training and organizational standards, even in the face of adversity."

e. *Enthusiasm*: "Serving with compassion and a sense of urgency while embracing a spirit of collaboration to make a difference in our community."[2]

19. At all times relevant hereto, Defendants violated CPD's mission statement, vision, and the core values (P.R.I.D.E.), breaking the accord that they made with the community of Columbus, Ohio.

20. Redress is being sought from all Defendants in their official and/or individual capacities.

### III.   JURISDICTION AND VENUE

21. This Court has federal question subject matter jurisdiction, pursuant to 28 U.S.C. §§ 1331 and 1343, as this action is brought pursuant to 42 U.S.C. § 1983 to redress a deprivation of constitutional rights as set forth herein.

22. This Court has personal jurisdiction over Defendants and venue is proper in this Court under 28 U.S.C. § 1391(b)(1)-(2) because, upon information and belief, Defendants reside in this judicial district and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.

### IV.   STATEMENT OF FACTS

23. On July 8, 2023, Antwan Lindsey is involved in an altercation that resulted in police being called to an apartment building at 3110 E. Livingston Avenue, Columbus, Ohio, in Franklin

---

[2] *Id.*

County.

24. As Sergeant Goodrich, Officer Thomas, Officer Cook, Officer McGinty, and an officer whose name has been redacted from public records and who would eventually fire his taser at Mr. Lindsey (hereinafter "Officer Taser,") arrive on scene, they form a perimeter, surround the building, and thereafter enter the apartment building from the front and the rear entrances of the building.

25. While at the top of the front stairwell, Officer Thomas, Officer Cook, Officer McGinty, and Officer Taser ("the Stairwell Officers") find Mr. Lindsey at the bottom of the front stairwell in the threshold of the door to the lower-level hallway and the stairwell, with no weapon on his person and his arms raised about chin high (see the picture below):



26. Having surrendered his firearm and placed it on the ground, Mr. Lindsey stands by a blue door as officers from the stairwell yell commands not to move and to show his hands.

6

27. Meanwhile, four Columbus police officers, Shooters 1, 2, 3, 4 (whose name has been redacted in the public records published on this matter and are therefore not available at the time of the drafting of this Complaint) along with Defendant Sergeant Goodrich (hereinafter "the Defendant Hallway Officers") approach Mr. Lindsey in the hallway from the other side of the blue door and position themselves about 45 feet from Mr. Lindsey.

28. The Defendant Hallway Officers yell commands for Mr. Lindsey to put his hands up and not to move.

29. While Mr. Lindsey stands motionless in the doorway, the voices of the Stairwell officers are audible on the body worn cameras of the Defendant Hallway Officers.

30. The voices of the Defendant Hallway Officers are audible on the body worn cameras of the Stairwell Officers.

31. Review of the Defendant Hallway officer's body worn camera ("BWC") footage reveals that the Stairwell Officers give orders to Mr. Lindsey to not move.

32. Review of the Stairwell officer's body worn camera ("BWC") footage reveals that the Defendant Hallway Officers give orders to Mr. Lindsey to not move.

33. As the Stairwell officers in front him and the Defendant Hallway officers behind him yell commands to not move, Mr. Lindsey complies, standing still and not moving in the doorway.

34. Thus Mr. Lindsey surrenders to law enforcement authority.

35. Then the Stairwell Officers start yelling "TASER, TASER, TASER!"

36. Their yelling is loud enough that it is captured by the body worn cameras of the Defendant Hallway Officers.

37. Suddenly, Officer Taser discharges his bright yellow X26P Model Taser at Mr. Lindsey.

38. The Taser makes a loud popping noise, and its prongs strike Mr. Lindsey causing an electrical current to flow into Mr. Lindsey's body which tenses and falls uncontrollably.

39. That is when the Defendant Hallway Officers, specifically Shooters 1, 2, 3, and 4, who are present with and supervised by Defendant Sergeant Goodrich immediately start shooting Mr. Lindsey.

40. Thirty-eight rounds are fired at Mr. Lindsey (Shooter 1 fires 13 rounds; Shooter 2 fires 12 rounds; Shooter 3 fires 10 rounds; and Shooter 4 fires 3 rounds), and he dies in the threshold of the doorway.

41. Plaintiff asserts that the Defendant Hallway Officers' use of lethal force on Mr. Lindsey, who had surrendered and was incapacitated at the time of the deployment of a Taser when he did not pose a serious threat of harm to any person, constitutes an unreasonable use of force in violation of the Fourth Amendment of the United States Constitution.

## CLAIMS ALLEGED

### COUNT I
### 42 U.S.C. § 1983 – Excessive Force

42. All preceding paragraphs are incorporated as if fully re-written herein.

43. This claim is brought pursuant to Title 42 U.S.C. § 1983.

44. Title 42 U.S.C. §1983 states, in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.…"

45. The Fourth Amendment to the United States Constitution states, in relevant part, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against

unreasonable searches and seizures, shall not be violated. . . ."

46. For decades, the United States Supreme Court has interpreted the Fourth Amendment to the United States Constitution to prohibit a police officer's use of excessive force during the arrest of a fleeing citizen that does not pose an immediate threat to officers or others. *See,* e.g., *Tennessee v. Garner*, 471 U.S. 1, 2 (1985).

47. At all times relevant to this matter, Defendants were clothed with the authority of the state and misused that authority.

48. While acting under color of state law, Defendants deprived the decedent, Antwan Lindsey, of his well-established right to be free from excessive force, per the authority cited herein.

49. At all times relevant to this action, the decedent had the well-established constitutional right not to be subjected to excessive force while being arrested, even if his arrest could have otherwise been proper.

50. In other words, on July 8, 2023, Defendants were only permitted to use the amount of force necessary under the circumstances to arrest the decedent.

51. Defendant Hallway Officers used excessive force when they arrested and/or seized the person of decedent by shooting him and killing him when decedent posed no immediate threat of harm to officers or others.

52. As a direct and proximate result of Defendant Hallway Officers' actions, the decedent experienced extreme pain and suffering, financial loss, and, ultimately, death for which Plaintiff Renatta Lindsey, as the personal representative of the Estate of Antwan Lindsey, seeks compensation.

53. As a direct and proximate result of all actions and failures to act of all Defendants identified herein, Plaintiff Renatta Lindsey, as the administrator of the Estate of Antwan Lindsey

and as wrongful death beneficiary of the decedent, has been damaged, including but not limited to loss of support of the decedent, loss of companionship of the decedent, mental anguish, and emotional agony.

## COUNT II
### Supervisory Liability

54. All preceding paragraphs are incorporated as if fully re-written herein.

55. This claim is brought pursuant to Title 42 U.S.C. § 1983.

56. Defendant Bryant, Defendant Sergeant Goodrich, and/or John Does Nos. 1-15 are supervisors of Defendant Officers (hereinafter "the Supervisory Defendants").

57. At all times relevant to this action, the Supervisory Defendants knew or reasonably should have known, and/or participated in, and/or condoned, and/or ratified Defendant Officers' use of lethal force against the decedent when the decedent posed no immediate risk of harm to any officer or civilian, to wit: Sergeant Goodrich supervised and directed the Hallway Defendants to shoot Mr. Lindsey at a point when he had been incapacitated by a taser deployment and had otherwise stopped moving in response to officer commands to remain still.

58. Defendant Sergeant Goodrich knew or reasonably should have known that his acts and/or failures to act would likely cause the constitutional injury that befell Plaintiffs and the decedent because he:

   a. Endorsed, promoted, encouraged, and/or participated in the shooting of Mr. Lindsey at a point when he had been incapacitated by a taser deployment and had otherwise stopped moving in response to officer commands to remain still;

   b. Increased the decision-making stress of armed officers by failing to establish a clear means of communication between the Stairway Officers and the Hallway Officers under his command.

    c. Increased the decision-making stress of armed officers by positioning himself and the Hallway Officers he supervised in the direct line of fire of fellow officers.

    d. Decreased the decision-making time and increased the confusion of armed officers by positioning himself and the Hallway Officers he supervised in a dimly lit hallway that did not give clear view of Mr. Lindsey, and which amplified and garbled audible sounds made in the hallway;

    e. Failed to coordinate and plan the deployment of law enforcement resources and tools at the scene and within the permitter of law enforcement control; and

    f. Failed to train Defendant Officers on the appropriate use of force, in-door arrest tactics, the coordination of communication among responding officers at the scene of law enforcement involvement, and the coordination of the deployment of officers at the scene of law enforcement involvement.

59. Defendant Bryant knew or reasonably should have known that her acts and/or failures to act would likely cause the constitutional injury that befell Plaintiffs and the decedent because she:

    a. Failed to train Defendant Officers on:

        i. the appropriate use of force,

        ii. in-door arrest tactics,

        iii. the coordination of communication among responding officers at the scene of law enforcement involvement, and

        iv. the coordination of the deployment of officers at the scene of law enforcement involvement;

60. As a result of their failures and abandonment of their supervisory duties, as stated above, the Supervisory Defendants created an environment that condoned the aforementioned

conduct and perpetuated and/or facilitated and/or aided Defendant Officers in the unreasonably violent seizure of Mr. Lindsey's person and the taking of his life when he posed no threat to Defendants or anyone else at the time he was killed.

61. The Supervisory Defendants engaged in acts and omissions that were the product of a reckless or callous indifference to the decedent's constitutional rights, including training, endorsing, and/or condoning Defendant Officers' shooting at subjects in the manner detailed above, i.e., when the subject had no weapons in his possession nor posed any threat to them or others.

62. By their acts and failures to act, as stated above, the Supervisory Defendants in fact caused the deprivation of the decedent's constitutional rights, including violations of the Fourth and Fourteenth Amendments to the United States Constitution.

63. As a direct and proximate result of the Supervisory Defendants actions and inactions, the decedent experienced extreme pain and suffering, financial loss, and, ultimately, death for which Plaintiff Renatta Lindsey, as the personal representative of the Estate of Antwan Lindsey, seeks compensation.

64. As a direct and proximate result of the Supervisory Defendants actions and inactions, Plaintiff Renatta Lindsey as the administrator of the Estate of Antwan Lindsey and as wrongful death beneficiary of the decedent, has been damaged, including, but not limited to, experiencing loss of support of the decedent, loss of companionship of the decedent, mental anguish, and emotional agony.

### COUNT III
### Municipal Liability pursuant to *Monell*

65. All preceding paragraphs are incorporated as if fully re-written herein.

66. This claim is brought pursuant to 42 U.S.C. § 1983.

67. Municipal bodies, like Defendant City of Columbus, are liable for constitutional

violations under 42 U.S.C. § 1983 when execution of their official policies or customs deprives an individual of rights protected by the Constitution. *Monell v. Dep't of Soc. Servs. Of City of New York*, 436 U.S. 658, 694 (1978).

68. Official policies or customs can result from: (a) a formal regulation or policy statement; (b) an informal custom amounting to a widespread practice that, although not authorized by written law or express policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (c) the decisions of employees with final policymaking authority; (d) the ratification of such final policymakers of the decisions, and the basis for them, of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (e) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

69. A municipality is liable under § 1983 when its agency's policy or custom, as evidenced in any of the manners set forth above, is "closely related" to the ultimate constitutional injury suffered by the plaintiff, and/or causes or occasions the constitutional violation. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989).

70. Defendant City maintains an armed police force, the Columbus Division of Police, with the power to arrest citizens.

71. Defendant City is also ultimately responsible for the assignment of personnel for training and disciplinary purposes.

72. Defendant City is aware that its officers engage in violent behavior that involves excessive force in violation of the Fourth Amendment, which disproportionately involves African Americans, like the decedent.

73. Defendants McSweeney-Pishotti, Bryant and/or John Does Nos. 1-15 are the top

policymakers for the City of Columbus Division of Police (hereinafter "Policy Making Defendants").

74. Since 2015, nearly one-third of all the Black people shot by police in Ohio, have happened at the hands of the Columbus police officers.[3]

75. According to the organization Mapping Police Violence, Black people are 4.6 times more likely to be killed by police than White people in Ohio.[4]

76. Between 2017 and 2019, even though only about 29% of the City's residents are Black, they made up 52% of those that were the subject of the approximately 1,128 police uses-of-force.[5]

77. In 2017, Black victims of CPD's uses-of force accounted for 52% or 319 of the incidents.[6]

78. In 2018, Black victims of CPD's uses-of force accounted for 55% or 311 of the incidents.[7]

79. In 2019, Black victims of CPD's uses-of force accounted for 49% or 233 of the incidents.[8]

80. In 2021, Columbus Mayor Andrew Ginther requested the DOJ examine Columbus police practices and policies, particularly pertaining to racial bias. The report stated that in 2022, Black victims made up only 29.1% of the Columbus population but accounted for 53% of the tracked

---

[3] https://www.usatoday.com/story/news/factcheck/2020/06/09/fact-check-online-post-wrong-blacks-killed-columbus-police/5325945002.

[4] https://mappingpoliceviolence.org.

[5] https://www.dispatch.com/story/news/crime/2021/11/11/columbus-police-use-force-most-against-black-residents-study-finds/6373146001.

[6] https://www.accountablenow.com/department/columbus-police-department.

[7] *Id*.

[8] *Id*.

uses of force, while white victims made up 54.9% of the population but only 29% of the uses of force.[9]

81. According to the conclusions of the DOJ report on CPD "[i]t appears they have operated under a culture that was extremely resistant to change in the past, despite efforts by many to advocate for modernizing systems, technology, and operational practices." The DOJ also found that the department does not track race in all incidents where police use force to subdue suspects and relies on an outdated system where officers file paper reports that are hand-delivered throughout the department.[10]

82. This pattern and practice with respect to the use of excessive force, inadequate reporting techniques, and the failure of CPD to discipline officers for the use of that force, is part of a larger pattern of excessive force and deadly force that has been pervasive within CPD in recent years and under Policy Making Defendants' supervision.

83. The result is the Policy Making Defendants created an unwritten policy or custom within CPD of "shoot first and ask questions later," in situations where, as here, a citizen is surrendering to police.

84. The "shoot first" policy or custom is known to the Policy Making Defendants, and they approved, ratified, encouraged, and/or promoted this policy or custom throughout CPD.

85. Following the death of the decedent, the Policy Making Defendants continue to approve, ratify, encourage, sanction, and/or promote the "shoot first" policy or custom as they expressed support for the Defendant Hallway Officers' actions regarding the death of the decedent,

---

[9] https://www.dispatch.com/story/news/crime/2024/08/21/doj-review-analyzes-columbus-police-use-of-force-finds-data-lacking-department-of-justice-report/74860921007.

10 Jensen Hughes. 2024. Columbus (Ohio) Division of Police: Independent Review of Use of Force Policies, Procedures, and Protocols. Collaborative Reform Initiative Critical Response. Washington, DC: Office of Community Oriented Policing Services.

15

imposed no discipline on Defendant Hallway Officers, and changed no officer training at CPD.

86. Defendant City of Columbus maintains an unwritten policy or custom of allowing officers to shoot in the direction of citizens when the officer is not facing an actual threat of death or serious physical harm and/or the officer knows or has reason to believe the person is not trying to shoot, injure, or harm any other person.

87. The aforesaid unwritten policy or custom put the decedent at unreasonable risk of grievous bodily harm, injury, or death.

88. The aforesaid unwritten policy or custom did in fact cause the death of the decedent.

89. At all times relevant hereto, Policy Making Defendants initiated, authorized, condoned, ratified, and/or encouraged the aforesaid unwritten policies or customs, as they were on actual and/or constructive notice of these policies or customs but did nothing to change them.

90. Defendant City of Columbus is also liable under *Monell* because the department's training, decision-making, and policymaking with respect to using force, including the use of firearms and training officers about their use, is so inadequate that it shows CPD's deliberate indifference to the constitutional rights of citizens.

91. Under *City of Canton v. Harris*, liability may attach to a municipality if "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390.

92. The above-mentioned statistics and circumstances show "the need for more or different training," as the Supreme Court put it in *City of Canton v. Harris*.

93. CPD's toleration of and failure to discipline officers who engage in excessive force

against African Americans, even when the force results in the City paying monetary civil rights settlements, is evidence that Plaintiffs' injuries are traceable to the City's custom of permitting excessive force, and it is evidence that the City has acted with deliberate indifference in failing to supervise its officers. *See, e.g.*, *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997) (stating that "an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law").

94. CPD's failure to adequately train its officers, including Defendant Officers, concerning the appropriate use of force and/ or to discipline them for their prior instances of excessive force directly and proximately was the moving force behind the violation of the decedent's Fourth and Fourteenth Amendment rights and, ultimately, his death.

95. As a direct and proximate result of Defendant City's policies and unwritten customs as set forth above, the decedent experienced extreme pain and suffering, financial loss, and, ultimately, death for which Plaintiff Renatta Lindsey, as the administrator of the Estate of Antwan Lindsey, seeks compensation.

96. As a direct and proximate result of Defendant City of Columbus's policies and unwritten customs as set forth above, Plaintiff Renatta Lindsey as the administrator of the Estate of Antwan Lindsey, and as wrongful death beneficiary of decedent, has been damaged, including, but not limited to, experiencing loss of support of the decedent, loss of companionship of the decedent, mental anguish, and emotional agony.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against Defendants, jointly and severally, for not less than $75,000.00, including but not limited to:

A. Compensatory and consequential damages for the Estate of Antwan Lindsey and the wrongful death beneficiary in an amount to be determined by the Court in excess of the Court's jurisdictional amount;

B. Punitive damages against Defendants in an amount to be determined at trial, for their willful, reckless, and malicious conduct;

C. Equitable relief, including, without limitation, that Defendant City of Columbus be made to adopt appropriate policies to prevent future instances of the type of misconduct described herein;

D. Attorneys' fees and the costs of this action and other costs that may be associated with this action; and

E. Any and all other relief that this Court deems equitable, just, and proper.

## JURY DEMAND

Plaintiffs respectfully demand a trial by jury of the within matter.

Respectfully submitted,

/s/Kenneth P. Abbarno
Robert F. DiCello (0072020)
Kenneth P. Abbarno (0059791)
Joseph T. Frate (0101377)
**DiCELLO LEVITT LLP**
8160 Norton Parkway, Third Floor
Mentor, Ohio 44060
440- 953-8888
rfdicello@dicellolevitt.com
kabbarno@dicellolevitt.com
jfrate@dicellolevitt.com

***Counsel for Plaintiffs***